## 8899

RITTENBERG v. ATLANTIC COAST LINE R. R. CO.

(83 S. E. 600.)

RAILROADS. FIRES. CIRCUMSTANTIAL EVIDENCE. ISSUE FOR JURY. CONTRACT EXEMPTION FROM LIABILITY. RENEWAL.

1. Where, in an action for destruction of a sawmill from a fire started by sparks from a locomotive, there was no direct proof of the cause of the fire, but there was evidence that the locomotive was "laboring like it had a double load," that there was a waste about, and "everything was dry," and a strong wind blowing, and that the engine was within 30 yards of the mill, the question whether defendant's locomotive started the fire was for the jury, though there was also evidence that the spark arresters on the engine were in good repair.

2. Where a contract between a railroad company and the owner of a sawmill based the liability for damages from fire to cases of gross negligence, and provided that by giving 30 days' notice before the end of the year for which the contract was made it could be renewed for another year, several letters between the parties, the first being written five months after expiration of the contract, in which no conclusion was reached as to a renewal, did not renew the contract so as to relieve defendant from liability for a fire which destroyed the mill, where it appeared that the spur track, the use of which was the consideration for the contract, was not used by plaintiff after expiration of the contract, and that the presence of the spur track unused did not add to defendant's fire risks.

Before Hon. C. J. RAMAGE. special Judge, Monck's Corner, November, 1913.    Affirmed.

Action by G. Rittenberg against the Atlantic Coast Line Railroad Company. From judgment for plaintiff, defendant appeals.

The following is the correspondence referred to in the opinion:

St. Stephens, S. C., March 20, 1912.
Mr. J. C. Murchison, Supt., Charleston, S. C.

Dear Sir: I expect to close down my mill in a few days after I get out a few more cars of stuff, and expect will close for a few months until I start up again and while I will

not have any one there to light the lamp would like for you to have my siding spiked down for that length of time, until I start up again.    Will advise you when I move out the last few cars from there.

Yours respect.,                          G. RITTENBERG.

Charleston, S. C., March 23, 1912.

Mr. G. Rittenberg, St. Stephens, S. C.

Dear Sir: Your letter of the 20th received.    If you expect to discontinue operating your spur track for several months, I would prefer taking out the switch and frog rather than to spike the switch down.    I would be glad to know about when you will be ready to discontinue using it, and about how many months before you will want it again.

Yours truly,    . J. C. MURCHISON, Superintendent.

St. Stephens, S. C., 6-8-'12.

Mr. J. C. Murchison, Supt., Charleston, S. C.

Dear Sir: By your request yesterday I called on Mr. G. Rittenberg relative to the spur track at south end of Santee trestle.    He tells me that he will want to use track again in about a month, more or less, and that he does not want track taken out, says he will write you relative to the matter.

Very resp'y,              W. R. WILDER, SR., Agent.

Charleston, S. C., June 12, 1912.

Mr. G. Rittenberg, St. Stephens, S. C.

Dear Sir: I will be obliged if you will write me at once how much more business you expect to ship from the spur track near Santee Swamp during the next twelve months. If you do not expect to ship very much business from this point during that time I want to arrange to take the track out at once.

Yours truly,    J. C. MURCHISON, Superintendent.

. St. Stephens, S. C., 6-26-'12.

Mr. J. C. Murchison, Supt., Charleston, S. C.

Dear Sir: Regard the switch light at my mill.    I have arranged with Mr. T. H. Goekliar, section master at that

place, to keep light lighted at my switch.   Hope this will
prove satisfactory.   I got about 25 cars of timber at my
mill yard that I am trying to dispose of at any time.

   Yours respect.,      G. RITTENBERG.

         Charleston, S. C., June 27, 1912.

Mr. G. Rittenberg, St. Stephens, S. C.

 Dear Sir: Your letter of the 26th inst. received.   I note
you claim to have 25 cars of lumber at your siding to ship.
Please advise how long it will take you to ship this lumber.
As we have not handled sufficient business from your siding
to justify keeping it in, it will be necessary to discontinue it
unless we have some positive assurance that there will be
enough business offered to keep it in operation.

 Kindly let me hear from you as soon as possible.

   Yours truly,  J. C. MURCHISON, Superintendent.

           New York, 8-8-'12.

Mr. J. C. Murchison, Supt., Charleston, S. C.

 Dear Sir: Yours of 7-31st, was forwarded to me here.
Now regard to the spur track.   Will say I cannot see how
you can take it out after I spent so much to put it in, as I
said before I am trying to make a deal to sell out all my
lumber what I got on yard of which it is about 20 to 25 cars,
and again I give option to a party to sell the entire track of
timber mill machinery and co. and if I do make that deal
the parties will certainly make use of the track to mfging
and ship lumber, therefore must ask you to look into this
matter and not put me out that way right now.

   Yours respect.,      G. RITTENBERG.

      Charleston, S. C., August 10, 1912.

Mr. G. Rittenberg, St. Stephens, S. C.

 Dear Sir: Your letter from New York received this morn-
ing.   As there has been no business moving from the sid-
ing put in for your sawmill, we, of course, cannot maintain
the track without sufficient business offering to maintain it,
and I would be glad if you would let me know before

August 30th what we may expect in the way of business from your track during the next six months, and I will then let you know whether or not the business will justify keeping the track in.

Yours truly,     J. C. MURCHISON, Superintendent.

Sidetrack Near St. Stephens, S. C.
Charleston, S. C., Oct. 4, 1912.
Mr. G. Rittenberg, St. Stephens, S. C.

Dear Sir: I am advised by our Mr. Wilder, Agent St. Stephens, that you will have no more business to move from this siding and that track can be taken up at any time. This is to advise that track will be taken out on November 10th, and this will serve as notice according to the terms of agreement.

Yours truly,     J. C. MURCHISON, Superintendent.

The following is the agreement put in evidence in the case, referred to in the opinion:

First. That it will furnish all necessary switches, rails, spikes, fastenings, and other metal material, and will proceed as soon as reasonably practicable to do, at the expense of the second party, the work necessary to lay said rails and construct said track, after the second party shall have prepared the roadbed therefor.

Second. That it will thereafter deliver cars consigned to the party of the second part at the junction of said track with its main track, and will accept from said party of the second part cars loaded by him as hereinafter provided, for movement over its lines to destinations or to connections. The railroad company shall have the right to move its engines, cars, and machinery over said spur track to reach industries located thereon or reached thereby without any liability to reduce the rental agreed to be paid by the second party hereunder, and, to that end, to extend this spur track or connect there with other spurs.

The party of the second part covenants and agrees:

Fourth. That it will grade and prepare the roadbed for said side or spur track, in manner satisfactory to the railroad company, and will furnish and deliver on said roadbed all necessary cross and switch ties and labor laying track; and, further, that he will maintain said side or spur track in condition satisfactory to the railroad company, after the same shall have been constructed as aforesaid.

Fifth. That the railroad company shall not be liable as a common carrier, nor as a bailee, for any property loaded into any car on said side or spur track, until said car is attached or coupled to the engine or train by which it is to be moved from said side or spur track toward its destination, or until a bill of lading shall have been issued to the party of the second part therefor, and that until said car is so attached or coupled up, or until said bill of lading is issued, the said car and its contents shall be deemed and held to be in possession of the party of the second part, as far as liability is concerned. That said party of the second part further agrees that all shipments consigned to him for delivery on said side or spur track shall be deemed to have been fully and completely delivered as soon as the car or cars containing such shipment shall have been placed on said side or spur track, and detached from the engine or train on which it was moved, and that said railroad company shall thereupon be fully and completely relieved of any further liability therefor, either as common carrier or bailee.

Sixth. That the privileges hereby granted as to shipping and receiving goods and merchandise, from or on said side or spur track, shall not extend to any other person or persons than the party of the second part hereto; provided, however, the said railroad company may extend and grant such privileges to other parties under the terms and conditions set forth, but not to such extent or to such number of persons as will interfere with the rights of the party of the

second part, or impair the utility of the said side or spur track for his proper purposes, as herein set out.

Seventh. That said party of the second part further covenants and agrees with the said railroad company that he will promptly load and unload at his own proper cost and expense any and all cars that may be moved to and upon and from the said side or spur track for his use, or consigned to or by him, and all said cars, including tank cars, shall be subject to car service rules; and that he will promptly pay all such car service charges as may accrue to the said railroad company for any undue or improper detention of said cars; and that he will not claim or attempt to collect penalties for failure to deliver freight to furnish cars for loading or for failure to promptly transport any freight which may be shipped by or to him, provided such deliveries or movements of freights are performed with due diligence by the railroad company; and that all such cars placed upon said side or spur track shall be returned to the said railroad company in the same condition as when delivered; and, in the event of the destruction of or injury or damage to any such cars while on the said side or spur track, the said party of the second part will make good and pay to the railroad company all loss or damage occasioned by such destruction or injury, unless said party of the second part shall show and prove that the said destruction, damage, or injury resulted from the negligence of the said railroad company or its agents or employees in the lawful discharge of their duties.

Eighth. That from and after the construction of said side or spur track he will ship and receive over the line of railroad controlled and operated by the said railroad company all goods delivered by him or received by him to and from points reached by the line of railroad of the said railroad company, and its connecting lines or roads, provided that the rates or freight charges of the said railroad company shall not be higher than the lawful rates over other trans-

portation companies for like goods to and from such points, and that reasonably prompt service and delivery is made.

Ninth. That he will promptly load and unload at his own proper cost and expense all cars placed on said side or spur track in accordance with the rules and regulations of the Southeastern Demurrage Bureau subject to demurrage charges thereby provided, and that he will return all such cars as may be placed thereon in as good order and condition as when placed there, and that he will promptly pay to the railroad company all damages sustained by such cars which are in any way due to the acts of commission or omission of said party of the second part, his agents, servants, or employees.

Tenth. It is distinctly covenanted and agreed that, inasmuch as the second party desires for his convenience to use the premises leased, notwithstanding the proximity of railroad tracks, engines, and machinery thereto, and the operation of trains in the vicinity and the risk of fire on account thereof, and on account of the situation of the spur track and environments, any and all risks of fire to any property at any time upon or contiguous to said spur track, is assumed by the second party, and the second party hereby releases the said first party from all claims for damages arising or resulting from fire communicated to any improvements located or placed on or contiguous to said spur track, whether caused by locomotives, cars, engines, or machinery, or the operation thereof, or extending thereto from any fire on the property of the party of the first part, and the second party agrees to indemnify the first party, and hold it harmless from and against all claims and demands of every nature on account of injury or damage to, or loss of, any property of any nature whatsoever upon or contiguous to said spur track, or which may be stored thereon, which may be occasioned by, grow out of, or be incident to the operation of locomotives, trains or other machinery on said leased premises or in the vicinity thereof, or which may be caused by or grow out of

any other fire upon the property of the party of the first part, whether leased or not, and which may extend to the premises herein leased, saving and excepting such injury, loss, or damage as may be directly occasioned by the gross negligence of the first party.

Eleventh. That the title in the rails, spikes, fastenings, and other appliances, furnished by the railroad company, shall be and remain in the said railroad company, and that said appliances shall not be or become fixtures upon the real estate whereon said spur is built.

Twelfth. That the said railroad company shall be released and discharged from and shall not be liable for damages to stock of the party of the second part, which may be injured or killed on or contiguous to said side or spur track; that he will and does hereby assume the duty of keeping the road-bed and right of way of said side or spur track clean and clear of combustible and inflammable materials.

Thirteenth. It is mutually covenanted and agreed that this contract shall remain and be in force for the space of one year from date hereof, provided there is in the meantime no violation or breach of any of the stipulations on the part of the said party of the second part; that at the end of the said period of one year, if this contract shall then be in force and effect under its terms and stipulations, it may be renewed and extended by the party of the second part for another period of one year, upon the same terms, conditions and stipulations as are herein contained upon the party of the second part, giving to the railroad company, at least 30 days before the expiration of said one year, written notice of his intention and desire for such renewal and extension, and in such event, and upon such written notice being given, this contract shall be renewed, extended, and continued for a second period of one year; provided, however, that the party of the second part shall be in successful operation and business at the end of the said first period of one year, when the said written notice shall be given, and provided that the amount

of freight shipped, to and from said sidetrack, for the account of the party of the second part, shall in the opinion of the said railroad company be sufficient to justify such extension and renewal of this contract and the maintenance of the said side or spur track, and continue in force thereafter and until 30 days' written notice shall be given by either the said railroad company or the party of the second part to the other of its desire to terminate and end the same, and upon such written notice then so given this contract, shall terminate and be at an end.

Fourteenth. That the said railway company shall have the right, privilege, and power to cancel, annul, determine, and put an end to this agreement upon 30 days' notice in writing to the party of the second part, and same shall be likewise cancelled, in the event of the failure of the said party of the second part to keep and perform any of the covenants, conditions, agreements, and stipulations, herein contained, on its part to be kept and performed.

Fifteenth. That in consideration of the construction and operation of said side or spur track as aforesaid he will, and hereby does, waive any and all right to collect any penalty or penalties upon said railroad company by law or order of any corporation or railway commission, in event of failure to deliver, or for delay, or any other cause, and agree that he will not demand or collect any such penalty or penalties in connection with any business originating on or delivered on said side or spur track.

Sixteenth. And the said party of the second part expressly covenants with the first party he will at his own proper cost and expense, provide, build and furnish and at all times hereafter during the continuance and existence of this contract maintain and keep in good repair such suitable and proper crossings as may be necessary for the intersection of said side or spur track hereinbefore mentioned with the track of any other railroad company or of any corporation, company, person, or persons having and operating a railroad

track or of any public road or street which the said side or
spur track may cross; such crossings to be built, constructed
and maintained in manner satisfactory to and approved by
the railroad company.

Seventeenth. That he will from time to time and at all
times during the continuance of this lease, and the term
hereby granted, pay to the first party, whenever or as soon
as demanded by it, any and all taxes or assessments of every
kind whatsoever imposed, or levied upon the said track, their
value and use, whether State, county, or municipal.

Eighteenth. It is further mutually covenanted and agreed
that the said party of the second part will take care of, light,
clean, and put up and take down each day all switch lights
that may be necessary on account of the aforesaid siding;
the party of the first part to furnish the necessary and
required switch lights, oil, wicks, etc.

*Messrs. Simeon Hyde* and *Octavus Cohen,* for appellant,
submit: *Letters were part of contract, and extended its
terms before date of fire,* and cite: 34 S. C. 301; 92 S. C.
95. *Duty of Court to construe the letters:* 61 S. C. 276;
96 S. C. 14; 96 S. C. 74; 92 S. C. 95.

*Messrs. Nathan & Sinkler* and *E. J. Dennis,* for respond-
ent.

July 17, 1914.

The opinion of the Court was delivered by MR. JUSTICE
GAGE.

Action for tort, for the destruction by fire from a locomo-
tive engine of a sawmill plant, brought under the statute
(Civ. Code 1912, section 3226). The plaintiff had a ver-
dict for $6,000, and the defendant appeals.

There are four exceptions, and several assignments of
error in each. But the controlling issues are few and con-
spicuous. They may be stated under two heads: (1) Did

the defendant put out the fire? (2) What amount of care was due by the defendant, in view of the special contract denominated the spur contract agreement?

The plaintiff had a sawmill in Berkeley, not far north of St. Stephens station, on the west side of the defendant's railroad track. The mill was built on plaintiff's land, and a spur track was laid to it from defendant's main line. This spur track was built under a written contract betwixt the parties, the provisions of which are pleaded in defense, and to which reference will hereinafter be made.

The mill was idle and unoccupied at the time of the fire. The fire occurred August 6, 1912, midday betwixt 1 and 2 o'clock. On that day, between 11 and 12 o'clock, a through train of passenger cars running south, went dead on the track opposite the mill and 30 or 40 feet north of it, and there remained a half hour until a following local train from Florence came up behind it and pushed it into St. Stephens. Some of the defendant's witnesses testified: That the pushing engine "was laboring like it had a double load;" that "there was a lot of sawdust and waste lumber and stuff around there;" that "everything was dry;" that the wind was blowing 15 miles per hour from the engine towards the mill (weather bureau); that the engine had spark arresters in good repair; that there was no fire apparent about the mill about 1 o'clock; that the engine was within 30 yards of the mill.

It was a wise exercise of judgment by the Circuit Court to submit to the jury whether or not, under all the circumstances, the defendant's engine put out the fire. It would have been error to have granted a nonsuit or to have directed a verdict. Fires along railroad tracks are of such common occurrence that their origin may be safely left to proof by circumstances; and the rigid statute passed to stimulate railroad companies to the utmost endeavor to prevent such fires recognizes the fact that such fires occur with or without the exercise of due care.

The amount of care due by the defendant under the terms of the spur contract will be considered along with the defense which arises out of that contract. And that is the second real defense pleaded and relied upon by the defendant. When the mill was built and before the spur track was laid to it, the parties hereto made a remarkable agreement. It contains 18 paragraphs, and ought to be printed with the report of the case, and so also ought the correspondence betwixt the parties beginning March 20, 1912, and ending October 4, 1912, both inclusive.

The defendant relies upon the tenth and thirteenth paragraphs of that agreement, and the correspondence betwixt the parties, to reduce its liability from that fixed by the statute to that of slight care. But for the agreement, the defendant would be liable. Does the agreement relieve it? By the words of the agreement, it was operative only from November 10, 1910, to November 10, 1911. This fire occurred August, 1912, and at that time there was no agreement unless the parties had after November 10, 1911, "renewed and extended it for another year." The method for such renewal is prescribed by the thirteenth paragraph of the agreement, to wit, by the plaintiff "giving to the railroad company, at least thirty days before the expiration of the said one year, written notice of his intentions and desire for such renewal and extension." Confessedly that method was not pursued; nobody claims it was. If there was any renewal of it at all, it was *dehors* the agreement. The defendant relies on the correspondence betwixt the parties, before referred to, to evidence the renewal. There is none else.

The Court below left it to the jury to say whether the letters meant so much; and the defendant has excepted to that, upon the ground that it was the sole province of the Judge to construe the letters, and to tell the jury what they meant; and further, that they meant the contract was renewed and

extended for another year, to wit, until November 10, 1912;
and that the Court ought so to have directed the jury.

The issue of law, therefore, is not the construction of the
agreement of the parties, no part of it; but whether by the
letter writings that agreement has been "renewed and
extended" for a year after its expiration. It was not sought
to explain the letters by parol testimony; they speak for
themselves.

Granting that it was the province of the Court to construe
the meaning of the letters, and that it was error to have left
their meaning to the jury, which is not adjudged; yet, in
our opinion, the letters plainly do not amount to "written
notice of the plaintiff's intention or desire for such renewal
or extension;" nor do they, by implication, suggest that the
plaintiff desired a renewal or extension of the contract for a
year after November 10, 1911.

The first letter was written five months after the contract
had expired. Had the fire occurred within these five
months, there would have been no proven act by plaintiff
which defendant might claim as a renewal or extension of
the contract. The utmost, therefore, which the defendant
may contend for from the letters, is that from March 20,
1912 (the date of plaintiff's first letter), there was a
renewal. But if so, for what length of time, a year from
the date of that letter, or a year from the 10th of November,
1911?

There had been the exchange of six letters up to the time
of the fire. By them the parties had not come to any conclu-
sion about the operation of the plant or the spur track; the
status was unsettled on August 6, 1912. The plaintiff sug-
gested, in the letter of August 8, 1912, that he had a plan to
sell out the plant; but the agreement prohibited an extension
of spur track privileges to any other person (paragraph 6).
The defendant, in the letter of 10th August, wanted to know
if the business would justify a keeping of the track in. The
pith and point of the correspondence was whether the switch

should be nailed down pending resumption of operations, or whether it should be taken out. The presence of the spur track did not add to defendant's fire risks. There was no causal connection betwixt the presence of a spur and the damage of fire from locomotive engines to the plant. The plaintiff had to agree to exempt defendant to get the use of a spur. At all events, five months after the agreement had expired by its own terms, the mill was idle, and the spur track was not in use; and, when the fire occurred, the parties had not yet by formal notice, or implication, agreed to continue the force and effect of its many covenants set out in the eighteen paragraphs. The agreement had expired, and there was no exemption for the defendant's liability.

The appellant makes one more issue, and that is the value of the burned property. That was a question for the jury. There was no wrong statement of the law.

The judgment of the Circuit Court is affirmed.